and please be seated. Well, we have four matters on today's argument calendar. I understand that all counsel are present except in one, but perhaps that person is here. I will, therefore, unfortunately have to call the calendar. So when I call the calendar, in each case, each side will just get up and please let us know that you're here. United States v. Wilbern, 23494, counsel. Sarah Von Gretel, on behalf of Richard Wilbern. Kat, on behalf of Richard Wilbern. United States Securities and Exchange Commission v. Penn, 211348, 211352. Good morning, I'm Keith Miller, on behalf of Richard Wilbern. Good morning, I'm Mark Barnes, on behalf of Richard Wilbern. And Daniel Sturzowski, for the Securities and Exchange Commission, appearing by video. Yes, thank you. Dynasty Healthcare v. National Health. Finally, Hanson v. Santiago, 24235. Good morning, Your Honor. Joshua Lurie, L-U-R-I-E, on behalf of the Health Commission. Good morning, Your Honor. William D. Humboldt, on behalf of the Court of Appeals. Wonderful, thank you. So everyone's here. And I understand that Ms. Von Gretel, you've got an argument after this. Yes. On the 15th floor. So we'll try to expedite this. Thank you very much. We'll therefore hear argument in U.S. v. Wilbern, 23494. May it please the Court. Richard Wilbern's conviction hinged on unreliable DNA and The district court compounded its error in admitting this evidence when it violated Mr. Wilbern's right to cross-examine the forensic analysts who had generated it. The court also restricted Mr. Wilbern's access to counsel during the trial and failed to investigate allegations of juror racism after the conviction. Are you, on the DNA evidence, in U.S. v. Morgan, we described, understanding that each case is different, we described that as the district court's decision to admit that evidence in that case as not an abuse of discretion. So it's not, your argument is not that it's per se unreliable. Is that right? That's correct, Your Honor. In Morgan, this court upheld the admission they are finding no abuse of discretion but expressed no opinion on admitting the evidence in future cases. Since Morgan was decided, the New York Court of Appeals in Williams has recognized that this technology is not generally accepted within the scientific community, which is a change from before Morgan. In addition, the New Jersey Court of Appeals recently also found that it was not generally accepted. Are you talking about LCM DNA? Yes, Your Honor. Time has not been kind to this technology. So it's both developments in our understanding of how this technology is not reliable, but in addition, it's the specific circumstances here. This was a piece of evidence that was readily subject to contamination, collected in a way that made contamination likely, where the results of the testing showed contamination. All of the problems that experts have identified with low-copy testing were not hypothetical in this case. They were all apparent from the test results. This particular evidence was not sufficiently reliable to be admitted. The court would not have to go so far as to say that LCM is never admissible. And in fact, you might liken it to something like polygraph examinations or other testing where this court has said there may be circumstances under which the technology can be relied upon, but that is not the case here. What you can see is that the results against Mr. Wilburn showed contamination and it also showed what they call degradation. So allele drop-in, allele drop-out, and other problems with the testing. This was a situation where this umbrella that was left behind at the robbery was tested by three different laboratories. The Monroe County lab found that they could not get DNA results from the umbrella. Bode Technologies later tested swabs from the umbrella and found they could not get results. It was only OCME using this testing method that has literally never been used by any other accredited laboratory, forensic laboratory in the United States, and which OCME itself has since stopped using. Counsel, are you prepared to argue that the DNA test was the dispositive piece of evidence that went to the jury? Because there were also identifications and a lot of circumstantial evidence. So it's certainly not harmless. So obviously we're not making a sufficiency claim. The question is if it was wrongfully admitted, can the government establish that it was harmless beyond a reasonable doubt? And it absolutely was not. The government put forward the DNA evidence as the centerpiece of its case. In both openings and closings, it was emphasized by the prosecutor. Sorry, can I just pause for a second? In terms of you're making the evidentiary objection now, right? Not the confrontation clause. Correct. Just analytically for the moment. Yes. Is the standard then harmless beyond a reasonable doubt if it's not a constitutional issue? I'm sorry, I just didn't hear. Is it- Is it harmless beyond a reasonable doubt? Is that the standard if it's not a constitutional claim? For the wrong, so this was a fully preserved objection to- I thought that was Chapman versus California for constitutional claims. Why isn't it Cariocos? Because it's an evidentiary claim. Substantial and injurious effect. Your Honor, I believe the standard is harmless beyond a reasonable doubt, but in either situation, the government would not be able to meet it because this was their primary piece of evidence against Mr. Cariocos. Because I understand that would be the standard for the confrontation clause. But again, I thought, well, okay, I thought that was only for constitutional claims. Your Honor, in either scenario, the government cannot establish that it had no effect on the verdict. Whatever standard, Your Honor, applies, it made a difference in this case. The same is actually true of the identification testimony, which in this case, the DNA and the identification testimony worked together because both reinforced the other, undermining any claim that one could be unreliable because the other existed. But the identifications were also independently problematic. This Court has recognized the power of identification testimony, that in any case, it's something the jury might readily rely upon, and that it's not amenable to the traditional challenges. It's often not undermined by cross-examination or even by expert testimony, which is why wrongful identifications are supposed- The identifications you challenge, I just want to make sure I understand, are all identifications by witnesses who knew your client for some significant or not insignificant period of time. Is that correct? Yes, that's correct. And in the single prior case where the Court considered this type of identification through the Fifth Amendment framework, which was Arroyo, which was not precedential, it did apply the Neal v. Biggers framework. And that's understandable because in this case, the defense had testimony from Brian Cutler, an identification expert whom this Court has cited, explaining that acquaintances can make misidentifications in the same way that strangers can. And the reason is because they were making this identification from a very poor quality photo. This was a surveillance image from the robbery that had literally led to hundreds of misidentifications. This was a cold case robbery where there was no suspect arrested more than a decade after the crime. After the crime happened- Have we ever explicitly in an opinion used the Neal v. Biggers standard in the context of, in this context where witnesses have known the defendant for a long time? I believe Arroyo is the only case where there's been this intersection of a witness who knows the defendant making identification, in that case from a video surveillance, with a Fifth Amendment challenge. And it won't necessarily come up in a lot of cases because it may be that in many circumstances a person who knows someone can make a reliable identification. But that's all the more reason to apply the test, because if you apply the Neal v. Biggers test, then the reliable identifications are always- Was the request made at that trial to apply that test? Yes. Okay, so that was preserved. Yes, Your Honor. And Cutler testified to the jury? Yes. So the jury was able to hear this expert testimony, which, correct me if I'm wrong, I don't think it opined directly on the reliability of any particular witness identification, but it talked about the factors that presumably you would have wanted to be addressed at a weight hearing? Is that- That's correct, which is why we're not requesting remand for a hearing. I think that the record is sufficient for the court to find that these identifications were not reliable, and because they were not reliable, they never should have been admitted. Even though the jury had all of those considerations before it, and it could presumably have sorted out for itself, you're saying that this is the kind of thing that constitutionally had to be pre-screened by the judge? Yes, Your Honor. Unreliable identifications are inadmissible. They're not admissible so long as you can challenge them in court. I see that- I know your time is up with a red light, but I would be very interested in hearing you talk about the confrontation clause issue, if you don't mind. Briefly, Your Honor, fundamentally all of the analysts who were responsible for the testing and the initial evaluation of the testing data, the analysis and the editing of that data were not called to trial, and Mr. Wilburn's lawyers could not cross-examine them. Are you arguing that every analyst who tested the DNA or edited the data needed to testify? Your Honor, not necessarily every analyst, but in this case, there were key analysts who were missing. Literally all of the testing steps were performed- Was Nelson one of those? Who were the key analysts? Exactly, yes. Heather Nelson, Melissa Hayek were probably two of the key people. They were individuals who did key testing stages as well as editing of the initial testing data. The district court misunderstood this testing as essentially an output of a machine-generated process when, in fact, there are several steps where the subjective judgment of trained analysts is brought to bear on the data and the data is edited. The individuals who did the initial editing of that data were not present. Didn't O'Connor and Schmidt each independently verify the testing that had been done by these other analysts? No. The problem is that if you understand the way- I understand that they testified that they had an independent analysis of the data, but what they were looking at was the data that had already been edited by others. They were not looking at, quote, unedited or raw data because it had already been altered by the analysts who came before them, and, of course, they didn't do any part of the testing themselves. None of them were allowed to be cross-examined. Is that correct? That's correct. None of those earlier individuals. Not even the early ones or the later ones? Correct. There was no one in the middle of the process. There was the individual who first put the swabs in a test tube and then the last person in the chain who reviewed the file of the work done by others. So your suggestion is that because the last analyst to testify, who was subject to cross-examination, was relying on the, let's say, the output of other analysts' analysis, that that final analyst's testimony was inherently based itself and, I guess, introduced? Or you can tell me how you would characterize it. Was it based on other testimonial evidence from these other intermediate analysts who weren't? Or would you say that it was based on that, or would you say that the intermediate analysis was effectively introduced through the final analyst? How would you put it? I think it's more the latter because the DNA profile is this string of numbers, essentially. It's the allele calls at each location, and it's the electropharogram editing that gets you those numbers. And somebody's got to do that. Correct. So if the analyst who testified had looked at the first thing and redone the allele analysis and all the intermediate steps, you'd say, okay, that's great. I've got the analyst in front of me who's done all the work, and I can cross-examine them, even if they duplicated the work. But you're saying that there were intermediate steps done by somebody else, and those intermediate actions were not subject to cross-examination. Correct, as well as all of the testing that generated that graph. And I'll just note that this is not an issue with every kind of DNA testing. For both Monroe County and Bodie, there was a single analyst who testified to all of these steps. And so in many cases, in many laboratories, there will be a single person who does all of these steps, and it simply won't be an issue. OCMB does their testing in a particular way that involves many analysts in the process. And in this particular situation- But do all those analysts have to engage in the analysis with the idea that there's a criminal case in mind? Is that something that you've got to show? Well, it's an objective perspective. And so we would say that this is sufficiently testimonial in the sense that the sample was provided by a police department as part of its ongoing investigation with the goal of- But as you point out, it's a cold case. That they never stopped investigating, Your Honor. The objective perspective on this was it was- You know, a cold case, I don't know of a cold case where technically the police department would say we stopped investigating. So how do we distinguish this case from other cold cases? I think this Court has already talked about the standard in Garlick v. Lee and in James. It's the idea of whether it's being generated with an eye towards eventual use at a criminal trial. Regardless of whether that actually happens or not. Correct. And regardless of whether it's accusing a specific person at the time that it's generated. And so I do think this Court has already answered that question. And what is the evidence that these analysts who you wanted to cross-examine were, as an objective matter, thinking about a criminal case as they engaged in their analysis? Your Honor, I don't think we have to show what they were personally thinking about because we couldn't. I do think it's from an objective perspective. They received it, they're doing this testing at the behest of a police department as part of an investigation into a robbery murder. Can you describe for me, and I know you've got to go, but can you describe for me a circumstance under which a DNA analyst would be engaging in an analysis of DNA without that in mind? Well, sure. And James provides a possibility. I mean, say there was some sort of natural disaster where you were trying to identify remains of people. No, no, where it's provided by a police department. I do think that might be the situation. And for example, I believe it's James, where there's an autopsy report that's generated that they don't at first think that it's a homicide investigation. And so under those circumstances, the court said that because initially it was more of a routine autopsy where they did not anticipate it would be a homicide investigation, that would not be testimonial. Did Mr. Wilburn come to the attention of the police before or after the DNA testing? So he was first identified in a cold call by Jamie Labatt, who saw the evidence, who saw the surveillance images. And that was well before the DNA testing. That was after the OCME low copy testing of the umbrella. Oh, it was after. Yes. Can I ask, again, putting out hypothetical situations of other DNA testing scenarios, I guess, in the world. You know, you see a lot about these websites like 23andMe where people send in their DNA to find out their ancestry. And then subsequently, you know, the police take their cold case, say their umbrella swab, and they send it, and they find a match. Would it be your view that, say, send, you know, the records of a DNA testing at like 23andMe would arguably be non-testimonial because they're the sort of thing that, you know, just people send in for all sorts of reasons. They could be introduced as business records. Because, in fact, you know, they might be used for testimonial purposes in a criminal case, but odds are they're just used for people's curiosity. And then if later on it turns out that they're used for another purpose, well, you know what, they can come in as business records. Oh, well. Or, I don't know that you want to make that concession, but I'm just trying to imagine scenarios that are different from the police sending something in to be tested scenario. I do think that is a good example. Perhaps I don't want to concede it, but I do think that's right. If an individual just sends in their own DNA because they're doing ancestry research, and it's later acquired by a police department, I think probably the testing of that initial DNA that the person sent in wouldn't be testimonial. So I think that's correct. So that's sort of just another, again, I'm not asking you to concede, because who knows, five years from now you may have a case like that. And we'll remember. All right. We'll hear from the gentleman. And you've reserved your time for rebuttal. Good morning. May it please the Court. Katherine Gregory, Assistant U.S. Attorney representing the United States. The question before this Court regarding the DNA issue is a narrow one. Did the district court abuse its discretion when it fulfilled its gatekeeping function, evaluated hundreds of pages? So your friend on the—I'm sorry to interrupt, but we don't have a lot of time. Your friend on the other side tells us that after U.S. v. Morgan, for example, the New York State Court of Appeals and the New Jersey courts have significantly criticized the use of LCN DNA analysis. And that seems to undermine the reliability of that form of analysis. Can you just address that directly? Yes. I'm glad you brought that up, Judge Loyer. There's two aspects to that. The first is why I brought up this narrow question before the Court, because we're looking at what the district court did at the time that it did it. Did it abuse its discretion with the information that it had at that time, when it was almost immediately post-Morgan with all of the hundreds of pages? We're not looking at whether new things have come to light in the intervening years. The second part of this—and I'm glad that Roshot and Williams are brought up. Wait a minute. I appreciate that, and I love practicality and pragmatism. However, if it came to light that beyond a shadow of a doubt the analysis in a particular case was totally unreliable and every scientist who looked at it had cast real significant scientific doubt, does it matter that the district court was exercising its discretion at the time? This is a criminal case. Yes. So we want to get it right. In that situation, I would certainly hope that the government would be proactive in the situation Your Honor describes. But here—and I'd like to look at Roshot specifically, which, just to clarify, that was decided on a Friday. And as this Court knows, I assume, decisions are not typically available in Westlaw immediately. So when we filed on Monday morning, we were not aware of it. We were not intentionally trying to hide it from the Court. But in any event, even Roshot, the New Jersey appellate decision, said, quote, There is some evidence supporting a finding of general acceptance among the relevant scientific community, end quote. But in that case, the county prosecutor had failed to develop it. The county prosecutor in New Jersey, according to that appellate division, said, You've presented us with seven articles. You didn't present six of them to the trial court. So there were other issues going on in Roshot. And in particular, there was a tool called FST, which is a forensic statistical tool that's used to determine the probability that you'll find that person among the general population. But is anyone using LCN today? That's not an easy question to answer, and I'll explain why, Judge Fuller. Let me ask you this question. Is that answer in the record, the trial record? Yes. Yes, that answer is in the record. So Dr. O'Connor explained, in 2017, the FBI or CODIS changed its requirements to have more loci. So OCME had to change the kit that it used. Why don't you just tell us what CODIS stands for? That's an excellent question. You don't have to give us the words behind the acronym. Why don't you just describe to us what CODIS is? Yes, CODIS is the database that the FBI uses.  So they had to change to a different kit, a new kit, and that new kit tests down to, and I know I'm getting into the science, 37.5 picograms, which was previously termed low copy number DNA testing. So what was low is now acceptable? Everybody does it. That's the answer. Everybody is now doing it. They're just doing it with a new kit that tests down. So we can't just look at one data point post the district judge's decision, but a world of data points is what you're arguing? Yes, and I also want to clarify something. I think in the brief and to an extent at trial it was argued because they're using this new kit that that somehow means that the technology was unreliable at the time. On the contrary, the fact that it goes down that low means it's been commercialized. Everyone is doing it that low without the need for the increased cycle, which is the other term for the low copy DNA. Can I ask you, unless you were finishing a point on that, would you turn your attention to the confrontation clause issue? Yes. And just lay out the government's view? Yes. So that's another thing that I'd like to clarify. So with the lab analysts here, first, there was no confrontation clause issue in the sense that the lab results themselves were never admitted at trial. That was a problem, I believe, in Garlick v. Lee where there was this solemnity of the declarations that were admitted. They were almost like affidavits. Lab results never came in here. They were never submitted. So there isn't a confrontation clause issue with respect to the lab results because we didn't introduce them at trial. So the claim, though, relates to, as I understand it, the testimony of the last analysts in the chain of analysis, right,  and I understand the claim to be that the results were effectively communicated to the jury through that testimony, and those results were effectively testimonial. They may not have come in on paper, but the analyst didn't have any firsthand knowledge of it, and by saying, you know, I compared this data, it was effectively communicating the testimonial statements that were those data. How do you respond to that? I understand the question, and there's two points that I'll make. The first is that there was independent analysis of the results, and I know counsel believes otherwise, but Dr. O'Connor testified. But those are the results, right? Right. My understanding is that they're saying that the analysis that went into generating those results is the testimonials. Yes, and so Dr. O'Connor redid that analysis. That's what I'm trying to say. Dr. O'Connor testified. He actually found a mistake in the 2011 data, and he amended. He issued an amended error report. So he actually redoes the entire analysis? He doesn't redo the entire analysis. He redoes the interpretation of the electro-farogram, and in that way he discovered the error that Schmidt had made, and this wasn't really cross-examined on Schmidt at trial, I believe, for strategic reasons because it therefore looked like there had been a change. But she hadn't followed the proper protocol when she included that extra allele. The question is, was Dr. O'Connor then required to undertake the entire analysis, not just that one? No, this is just like any other expert opinion testimony. You can examine the things that that opinion is based on, and he was cross-examined at length as was Schmidt, as were the two other analysts that testified. And even Elizabeth Valle testified when they were asked, didn't you do any editing? Didn't you do any interpretation? She said no. Dr. Craig O'Connor is the one who does that aspect of the testing. So just to clarify, the first person who testified, let's take the 2011 stuff. There were two live witnesses, right? Yes. And the one said, just walk us through that. That took us through, what, getting the envelope with the swabs? Yes. That was primarily for, I believe, chain of custody issues that she was introduced to show that the swabs hadn't been tampered with, that that's where the process began. And then stopped to wear on the chain. Where did that witness's testimony take us through in this chain of testing? What's the cutoff point? That's a very good question. I apologize, I can't answer it off the top of my head. But at some point, all right. Yes. But it definitely cut off at some point in the testing, right? Yes. And then Schmidt and O'Connor explained how their lab works. They described it almost like an assembly line. And they rotate. So they rotate week to week to keep people fresh. So at what point did Dr. Schmidt's firsthand testimony pick up in that chain of events? It didn't pick up immediately after where the first analyst stopped off, right? No, it did not. And I understand talking about this is generally how it happens and everything. Yes. But there was some analysis done that was performed by somebody else. And it was the output of some of that analysis that was then relied upon by Dr. Schmidt going forward, right? For the expert opinion, yes. And Dr. Schmidt, again, was available for cross-examination. She was a supervisor. It's not as if she just popped in at the end of the process and looked at the raw data. She finished what my colleague would call the subjective. But she finished that interpretation of the electropharogram. So you're saying that how many analysts were involved altogether? I don't believe that number came out. Or if it did, I apologize that I don't recall. But I could submit something brief with that information that Your Honor is asking me as to that. I do want to just, with the very short time I have left, talk about that Crawford issue further. Yeah. Maybe if I could just ask my question, which I'm not sure I'm going to formulate it right. You know, one of my concerns here is the lab may have broken down the process of analysis for purposes of efficient administration into five or six people, right? Because it's just better to have one person working on a machine on Tuesday and another one working on Wednesday. And you're just going to process things more. But, you know, I think the defense's argument is basically, as you've seen in some of the cases, you know, the convenience of the government or the convenience of the laboratory is not relevant to the Confrontation Clause analysis, right? I mean, yes, this may be wildly inefficient to require one person to take everything from start to finish. If all the government wants is to have to put one witness on. But that's not really a consideration that can factor into our constitutional analysis. So then the question is, if there is some analysis that happens in the middle that nobody has testified about live so that there's no opportunity for cross-examination, how is it that we can say, well, experts, because it involves expert testimony, experts can rely on stuff people tell them. And therefore, we sort of get out from under the Confrontation Clause issue. I mean, doesn't that seem like using the expert testimony rules to make it really eviscerate the confrontation, right? Not at all, especially because Schmidt and O'Connor, in their respective testing, were involved in the process. They actively reviewed and were involved in the analysis. That's correct. And that's the distinction between this case, according to you, and those other cases where there was no active involvement by the testifying witness. But were they involved in all the analysis? And that's the question I would love to answer for your honor. Yes. If I could in the moment, but I would love to submit something to clarify that. There is just one last point, if I could briefly. Well, and let me just say that, because I think that could be a relevant point, right? Yes. If they were active and they had firsthand knowledge of the analysis that was performed by the other people, then great. They have firsthand ability to testify. But if they just reviewed the paperwork afterwards, then that doesn't, you know, if they weren't the people who did it, it would be like this. If you had a, or you tell me, maybe it's a bad analogy. Search of a house is conducted. One officer is the chain of custody, is the sergeant in charge of the scene. But sergeant doesn't go into all the rooms. Officers 1 through 5 are directed to rooms 1 through 5. They do a particular search. They seize all the evidence. They bring it to the sergeant who's waiting outside, but the evidence van is all checked in. You wouldn't say that because all the evidence was turned over to the supervising sergeant, that the sergeant is now able to testify that the glove was seized in the living room and the drugs were seized in the bedroom and all that, right? Now you have to bring in the people from the particular rooms. You may put on the sergeant as well for chain of custody reasons or to give an overall picture. But if you want to show the glove was taken from the living room, you need the cop who was in the living room. Or do you disagree with that premise? No, that premise sounds sound, Your Honor. So take that analogy. Tell me why, and this may be a bad analogy. Tell me why that's a bad analogy to the scenario we have here. And that may be because, if you want to follow through the analogy, maybe the sergeant was in each of those rooms or something else. Well, yes, that would be an instance if he was watching as the item was recovered, for example. So, yes, I understand Your Honor's concerns. And I certainly understand and appreciate the concern that some case might use this as an end run around the confrontation clause. Also, in your view, based on these facts, if you want to follow that analogy, is your view that the sergeant was in the room? In other words, was the sergeant, you know, was the Schmidt supervising and actually watching the analysis that was performed here? Or was it just after the fact learned about it and said, okay, I've read the papers on how you did it. I believe you when you did this because it all looks like you followed protocol. Yes, Your Honor. I cannot say as I stand here that Schmidt was standing over the shoulder watching them move the test tubes. I can say that there was testimony, and I don't recall specifically at this moment. That is the letter you want to submit? Yes. If it would be helpful to the court, and it sounds like that would be extraordinarily helpful. But I also want to point out the Supreme Court and this court have both said fairly recently that you do not have to bring every analyst in, especially where you are not putting those lab results into evidence, which did not happen. There was no affidavit, no asylum declaration. We presented the supervisors who performed part of the analysis, who supervised the work. I don't know if it was over the shoulder watching. Well, that's the trick, though, right? Yes. Is if they performed part of the analysis, then they could testify about the part of the analysis they did. But more importantly The question is can they testify about the part of the analysis if they did not actually participate or supervise other than that person works for me. And the other half of that question, though, is what was the purpose of this 2011? Because I don't think Mr. Wilburn is challenging the 2016 FBI licking the envelope DNA test. He's challenging the low copy number DNA test. The question is what was the purpose of this? And in Williams, the Supreme Court specifically said that the purpose of that test was not for use against a defendant at a criminal trial. It was to catch a dangerous rapist. The plurality opinion? I can give you the citation. I guess haven't we had two opinions since then saying we can discern no holding from Williams? And, therefore, we will base our decisions on all the pre-Williams cases because we can't make heads or tails out of that? But Williams was, I will point out, a criminal case. It was a criminal case where the DNA was developed before they had a suspect. If the Supreme Court had seen that as such a serious Crawford issue, that no investigation trying to catch someone who's unidentified, they certainly would have said so. But who would have said so? The plurality? I mean, the concurrence? The dissent? I mean, I'm sorry, who are we relying on in Williams? I don't know how to read Williams for any proposition of law. In that case, then, Your Honor, I think if we're trying to put aside Williams, again, it comes back to what are we looking at here and what is the standard of review? We're looking at an expert opinion testimony. Two experts who were cross-examined about the basis for their conclusions and whether there were, as this Court said in Amorgianos, good grounds for those conclusions. At length. We are not talking about lab results. We are talking about their opinion. And we had competing opinions. But their opinion was about the lab results. Their opinion was about their interpretation of data, just like any expert opinion is. That is expert opinion, right? I'm sorry? That's expert opinion. That's what expert opinion is, and I'll just briefly conclude, as I know we're short on time.  The district court reviewed hundreds of pages of scientific evidence, including the concerns that were raised by the Federal Defender's Office and the Legal Aid Society and the complaint that was submitted to the New York Inspector General. The confrontation clause claim was reviewed for abuse of discretion? I understand why the other, you know, the Daubert issue would be. Yes. No, I think that would go to the, I cannot recall the case right now, but with a constitutional issue like that, no. I don't believe the standard review is abuse of discretion, but I would have to clarify. But, again, the district court fulfilled that gatekeeping function. The government presented two analysts from each of the tests. The government presented two experts who were cross-examined for the basis of their opinions. The government never attempted to introduce those lab reports, and the Supreme Court in this court has never held that you have to present every analyst who moves a test tube in order to establish, or in order to fulfill that confrontation clause requirement. So unless the court has any further questions, we ask that you affirm the judgment. We might have further questions, but we'll let you go. Yes. Thank you. Counsel. Your Honor, hopefully I have this one right. To start at the end, I believe the Sixth Amendment claim is de novo review. With respect to the factual questions, and a lot of this testimony is starting at A1204, and it goes through about A1257, and that's Michelle Schmidt's testimony about the other analysts who did work before she was involved in the case. And just to be clear, there was testimony that she's not personally supervising any of this. The different analysts who are doing the testing are literally on different floors of OCME at the same time that it's going on. Is that also in the record? Yes, that's in the record. At those pages that you just gave us? That's Michelle Schmidt's testimony, and so that should cover most of this. Dr. O'Connor also testified about the witnesses who participated in the analysis before him. He gave slightly different names, and so there was some confusion about the number of analysts who worked on this case in total. But from our perspective, the critical testimony is from, like, 1208 to 1214, and that's where Michelle Schmidt explains that Heather Nelson did subjective analysis of the data before it came to her. And part of the issue here is understanding the way that the DNA testing works. And so what Michelle Schmidt and O'Connor are reviewing are exactly what Your Honor described, which is a file of the reports from other people, including the electropharogram that has already been edited. It has already had items removed from it because those prior trained analysts applied their subjective judgment that those should be removed. And that's the critical problem with this testing. I'm sure not, but didn't Mr. O'Connor, he reviews, and maybe there's a bit that he does not review, but he reviews much of the analysis. It's true. He reviews the worksheets that those other analysts complete. And so when they were- So how is that different from the head of a lab who, it's her lab, and she is responsible for getting funding from the government. And so she's going to review every bit. Are we going to require in that case every analyst to have to come in and describe, as part of this lab, and describe what he or she did? Your Honor, if you're putting in the- I'm having a problem understanding the implications and consequences of this. And I understand that the Confrontation Clause, at least as interpreted by the Supreme Court, is a hard and fast line. I appreciate that. So it eliminates some of the impracticalities or ignores them. But I think what you are suggesting is that in every case, every case, every analyst would have to be, including analysts who are long gone, would have to be called back, could be called back to testify. In a DNA case. There are a few answers. Any lab case. There are a few reasons this guy won't fall. One is that most labs don't follow this type of testing, as I said. So Monroe County, Bodie, they both had one person who had done all of the testing. Another answer is that different kinds of DNA analysis, not low-copy testing, don't involve this number of subjective judgments in terms of making allele calls. And I want to talk about the low-copy testing because it is not accurate to say that every lab today is now doing this because the kits have changed. So it is true that there are now more advanced kits that can test down to 37.5 picograms. One of the samples here was 18 picograms. So that sample would simply not be tested or analyzed by anybody today. The other sample was mixed, 188 picograms. But what OCME was doing, their particular methodology, was changing the commercial kits. And so that's why it gets invalid results. The commercial kits themselves are well validated before they are actually sold. And so they can say, our chemical method can accurately test down to this amount of DNA. What OCME was using was modifying the commercially available kit at the time and doing an off-label use of it. And that's why it generated results that were not reliable. So no one is using OCME's testing method today, including OCME. It's just that now the commercially available kits can go down to 37 picograms. So it really – one of the things that Dowbert recognizes – What about this argument that we should look at the district court's decision at the time? That's fine. The district court was wrong at the time as well. I mean, Your Honor, the district court – most of the district court's opinion is block quotes of the materials that it received in the list. Ultimately, it hinges its decision on the fact that this testing method was generally accepted within the scientific community and approved by OCME's accrediting body. And that was just – it was not true at the time that it was generally accepted within the scientific community. And I think that one of the things the defense pointed out to the court is that some of the decisions it was relying on were on appeal. So even at the time, the district court's finding was an abuse of discretion and did not truly engage with all of the scientific failings that people had identified with this technology. Thank you. Thank you very much. If my colleagues on the 15th floor give you a hard time, blame Judge Louyer. Thank you very much. Thanks very much to both of you. Thank you. We'll reserve the decision.